1

**GUTRIDE SAFIER LLP**
Seth A. Safier (State Bar No. 197427)
  seth@gutridesafier.com

2

Marie A. McCrary (State Bar No. 262670)
  marie@gutridesafier.com

3

Hayley Reynolds (State Bar No. 306427)
  hayley@gutridesafier.com

4

100 Pine Street, Suite 1250
San Francisco, California 94111

5

Telephone: (415) 336-6545
Facsimile:  (415) 449-6469

6

7

*Attorneys for Plaintiff*

8

UNITED STATES DISTRICT COURT

9

FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| SCOTT PFLAUMER, on behalf of himself and those similarly situated, | Case No. |
| Plaintiff, | CLASS ACTION COMPLAINT FOR VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT; FALSE ADVERTISING; UNFAIR COMPETITION LAW; AND; FRAUD, DECEIT, AND/OR MISREPRESENTATION; AND UNJUST ENRICHMENT |
| v. | |
| HAIN CELESTIAL GROUP, INC. d/b/a EARTH'S BEST, | |
| Defendant. | JURY TRIAL DEMANDED |

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**INTRODUCTION**</u>

1.    Plaintiff Scott Pflaumer, by and through his counsel, brings this action against Defendant Hain Celestial Group, Inc. d/b/a Earth's Best ("Defendant"), to seek redress for Defendant's unlawful and deceptive practices in labeling and marketing the Earth's Best brand baby and toddler food products.

2.    Intending to profit from parents' increasing desire to purchase healthy food for their young children, Defendant misbrands its baby and toddler food products with nutrient content claims on the product packages that the Food and Drug Administration ("FDA") strictly prohibits. FDA regulations specifically state that, except for certain circumstances that do not apply here, "no nutrient content claims may be made on food intended specifically for use by infants and children less than 2 years of age." 21 C.F.R. § 101.13(b)(3).

3.    Defendant's products at issue are intended specifically for children under the age of two. This intent is evinced by, among other things, Defendant's product labels, Defendant's representations on its website, Defendant's marketing strategies, and the manner in which Defendant sells its Products through retailers. For example, Defendant labels its Beef Medley puree pouch as being for children in "Stage 3," which Defendant expressly defines as children *9 months* and up. Defendant also labels its cookie products as intended for "toddlers" who can "chew solid foods." The word "toddlers" is defined by both Defendant and government agencies as children starting at one year old, and infants can chew solid foods starting around age *6-9 months* old. The front label of the yogurt smoothie products is silent as to the intended age, but is sold in the baby food aisle alongside other similar products intended for children as young as 6 months.

4.    Despite the prohibition on making nutrient content claims on its products, Defendant makes them anyway. For example, Defendant makes the claim "4g PROTEIN per serving" on its Beef Medley puree pouch, which is labeled as being for "Stage 3," which

Defendant defines to be children nine months and up. Defendant also makes "excellent source" nutrient content claims on many of its products marketed for children under two. For example, Defendant makes the claim, "Excellent source of Iron, Zinc, & six B vitamins" on its cookie products that, according to the product's label, are intended for "toddlers" that can "chew solid food," i.e., those as young as one year old.

5.    The claims are unlawful, and consumers rely on these unlawful claims in deciding to purchase Defendant's products. The claims are also misleading. They deceive reasonable consumers into believing Defendant's products are a healthful and appropriate source of nutrients for their children under the age of two. However, a growing body of evidence demonstrates that the products are not healthful or recommended sources of nutrients and should not be relied on for nutrients for children under the age of two. For example, baby food pouches hinder gross motor development in chewing, and they lead to obesity and overeating because, among other things, the process of pureeing the foods to put them in pouches separates the sugars from the fibers. The products are considered ultra-processed foods that lack health value. The products are high in sugar, far exceeding the threshold limits recommended by the WHO. Further, the products are full of added sugars beyond those naturally occurring in the touted ingredients even though guidance from leading health organizations dictates that children under the age of two should not have any added sugar. For example, in some of Defendant's products, 20% of the calories come from added sugar.

6.    Defendant's misbranding caused Plaintiff and members of the putative class to pay a price premium for the products.

**PARTIES**

7.    Scott Pflaumer is, and at all times alleged in this Complaint was, an individual and a resident of San Jose, California, and is domiciled in California.

8.      Defendant Hain Celestial Group, Inc. d/b/a Earth's Best is a corporation existing under the laws of the State of Delaware, having its principal place of business in the State of New York.

## JURISDICTION AND VENUE

9.      This action is brought pursuant to, *inter alia*, the California Business and Professions Code, section 17200, *et seq.* Plaintiff and Defendant are "persons" within the meaning of the California Business and Professions Code, section 17201.

10.     The injuries, damages and/or harm upon which this action is based, occurred, or arose out of activities engaged in by Defendant within, affecting, and emanating from, the State of California. Defendant regularly conducts and/or solicits business in, engages in other persistent courses of conduct in, and/or derives substantial revenue from products provided to persons in the State of California. Defendant has engaged, and continues to engage, in substantial and continuous business practices in the State of California.

11.     In accordance with California Civil Code Section 1780(d), Plaintiff concurrently files herewith a declaration establishing that, at various times throughout the class period, he purchased Earth's Best products in San Jose, California. Plaintiff's declaration is attached hereto as **Exhibit B**.

12.     Plaintiff accordingly alleges that jurisdiction and venue are proper in this Court.

## SUBSTANTIVE ALLEGATIONS

13.     Defendant manufactures, distributes, markets, advertises, and sells a variety of baby and toddler food products under the brand name "Earth's Best." Many of these products have packaging that predominately, uniformly, and consistently make nutrient content claims on the principal display panel of the product labels and are intended specifically for use by children under the age of two (the "Products"). A non-exhaustive list of the Products and the express nutrient content claims made on the product packages is attached hereto as **Exhibit A**.

**Recommendations for Foods for Infants and Toddlers**

14.     Early childhood nutrition, particularly during the first 1,000 days, is vital for healthy growth and development and for preventing overweight and obesity. Taste preferences and dietary habits are also formed during this critical stage of life, behaviors which often persist into adulthood.[1]

15.     Recognizing the need to optimize nutrition during these formative years, various governments and international organizations have developed dietary and feeding guidelines to provide guidance on what constitutes a healthy diet. These guidelines, such as those from the US Department of Agriculture (USDA) and the World Health Organization (WHO), recommend exclusive breastfeeding until six months of age with the introduction of appropriate solid foods at six months with continued breastfeeding up to two years.

16.     Recently, the WHO has developed a Nutrient Profile and Promotion Model ("NPPM")[2] that set benchmarks for different food categories in response to the need for better guidance and regulation for commercially produced infant and toddler food products.

17.     In the NPPM, the WHO criticized the suitability and marketing of food products on the market for infants and young children, including:

- High total sugar content and sweet taste profile;

- The addition of salt or high sodium content;

- Low nutrient or energy density in purees aimed at younger ages/early weaning;

---

[1] Coyle, D.H.; Shahid, M.; Parkins, K.; Hu, M.; Padovan, M.; Dunford, E.K. An Evaluation of the Nutritional and Promotional Profile of Commercial Foods for Infants and Toddlers in the United States. *Nutrients* 2024, *16*, 2782. https://doi.org/10.3390/nu16162782

[2] Nutrient and promotion profile model: supporting appropriate promotion of food products for infants and young children 6–36 months in the WHO European Region. Copenhagen: WHO Regional Office for Europe; 2022. Licence: CC BY-NC-SA 3.0 IGO. (Hereinafter "NPPM")

- Marketing of very smooth/pureed foods for children beyond 12 months of age despite the facts that:
  - Introduction of texture is important for chewing development;
  - Most infants can accept textured foods from 12 months; and
  - Ongoing exposure to purees, with high liberated sugar content is a concern for oral health and development of sweet taste preference;
- Misleading product names, which imply vegetable or savory flavors, or high dairy, vegetable or cereal content, but contains high fruit content and sweet taste;
- Marketing messages, including health and nutritional claims, that:
  - Undermine public health messages, such as the age of food introduction, the importance of increasing textures and food variety, and limiting snack food use;
  - Undermine confidence or displace home-prepared foods; and
  - Imply that features of the product are desirable or advantageous (such as "fits into little fingers", "no bits", "full of goodness" and "organic" etc.).[3]

18.     According to the WHO, commercially available foods for infants and young children "rely on the consumer assumption that they are specifically formulated and are healthier and superior to other commercial products for older children or adults. Many promotional messages and claims are designed to mislead or distract consumers from undesirable qualities, for example by emphasizing use of organic ingredients, convenience, taste or smooth texture."[4]

**Defendant's Products Are Unhealthy and Not Recommended**

***The Amount of Free and Added Sugar in the Products Is Harmful***

19.     The impact of sugar from whole fruits is different than the impact of sugar from

---

[3] NPPM at 2.
[4] NPPM at 22.

pureed fruits on the body. "Liberated sugars are defined as those that are released or 'liberated' from within plant cell walls during processing such as heat-treatment, maceration or puréeing. Liberated sugars have the same function as free sugars in terms of contributing to the sweet taste of foods and the speed at which sugars are absorbed into the blood stream. For example, fruit purée is particularly high in liberated sugar. Feeding fruit purée alone, or using it as an ingredient in other foods, means foods taste very sweet and blood sugar levels can rise rapidly."[5]

20.    This concept is also known as the "food matrix" of a food, which is defined by the USDA as "the nutrient and non-nutrient components of foods and their molecular relationships, i.e., chemical bonds, to each other."[6] The effect of the food matrix is that two foods of identical chemical composition, but with different structures, may have significantly different outcomes for health.

21.    Total sugar content is important to consider because it skews the energy density of low nutrient foods. The WHO recommends limiting total sugar intake, defined as "any intrinsic sugars contained within plant cell walls, liberated sugars, free sugars, and sugars naturally present in milk (largely lactose)".[7] Specifically the WHO recommends that products that have more than 30% of the energy from sugar carry a front-of-pack warning label to help consumers make healthier choices.[8] The energy intake from sugar can be determined according to the following formula:

(total sugar grams per specified product weight ÷ kcal per specified product weight) x 400.[9]

_____

[5] NPPM at 5.
[6] https://agclass.nal.usda.gov/vocabularies/nalt/concept?uri=https://lod.nal.usda.gov/nalt/17238
[7] WHO Guideline 2015: Sugars Intake for Adults and Children. Geneva: World Health Organization; 2015. PMID: 25905159. ISBN: 978-92-4-154902-8; NPPM at 14.
[8] NPPM at 19.
[9] NPPM at 10.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

22.    The Product chart in Exhibit A outlines the percent energy from sugar for each Product. All of the smoothie pouch Products (Product Nos. 1-6 in Ex. A) have a sugar density above 30%, which is the level at which the WHO recommends a front-of-pack "indicator label" for products intended for infants and toddlers because of the health risks associated with that level of sugar. [10] The smoothie pouch Products feature the word "organic" on the front of the pouch three times and feature images of whole, fresh fruits. The Products will not provide the same nutrients as the whole fruits featured on the products. They claim to be an "Excellent source of Calcium, Vitamins C & D." However, the high sugar profile will encourage a preference for sweeter foods that contribute to noncommunicable diseases, obesity, and dental decay; cause spikes in blood sugar; and can lead to picky eating. Thus, they are not an excellent source of the nutrients advertised and will instead harm children's health.

23.    Similarly, the Defendant's "Organic Letter of the Day" cookies also contain high levels of sugar, including added sugar. Despite guidance from the USDA that children under two should ***completely avoid*** added sugar, Defendant sweetens its cookie products with cane sugar, the second ingredient listed on the ingredient panel. There is a staggering 5 grams of added sugar in one 20g serving, meaning that nearly a quarter of the box is pure sugar. Just as a caregiver would never give their young child an overflowing teaspoon of sugar, they should not feed their child Defendant's cookies expecting them to be an "Excellent source of Iron, Zinc, & six B vitamins." The Products will displace healthier alternative sources of the advertised nutrients in the young child's diet. The high sugar profile will encourage a preference for sweeter foods that

[10] NPPM at 19.

contribute to noncommunicable diseases, obesity, and dental decay, cause spikes in blood sugar, and can lead to picky eating. Thus, they are not an excellent source of the nutrients advertised and will instead harm children's health.

### The Sodium Levels in Defendant's Products Are Harmful.

24.     The USDA Dietary Guidelines for Americans, 2020-2025 ("DGA") recommend choosing foods with less sodium given the increased risk of cardiovascular diseases and hypertension. DGA at 13, 17, 18, 20, 22, 30, 37, 46. The USDA recommends that "[c]omplementary foods [for infants] should be rich in nutrients, meet calorie and nutrient requirements during this critical period of growth and development, and stay within limits of dietary components such as added sugars and sodium." DGA at 59.

25.     The DGA explicitly notes that "[s]odium is found in a number of foods, including some salty snacks, commercial toddler foods, and processed meats." DGA at 61. The DGA notes that sodium should be limited for health, but also "another reason to avoid high-sodium foods is that taste preferences for salty food may be established early in life. Choose fresh or low-sodium frozen foods, when available, and low-sodium canned foods to minimize sodium content." DGA at 61.

26.     The reasons for not adding salt to supplementary food for infants are that it "may damage the developing kidney[s]," "may pre-dispose to high blood pressure" "make them prefer salty food later in life" and "[whole] food contains enough sodium to meet the physiological needs of children during this period".[11]

_____

[11] S Yang , H Wang, Avoidance of added salt for 6-12-month-old infants: A narrative review Archives de Pédiatrie , volume 30 , p. 595 - 599 Posted: 2023

27.    In its NPPM, the WHO recommends limits of 50mg of sodium per 100g of food.[12] The reason for the limit is not only because of the health impact of salt, but also "to prevent children becoming accustomed to a diet with high salt content."[13] Put differently, the recommendation not only considers to daily intake of sodium, but the density or "saltiness" of foods that are being consumed.

28.    Defendant's "Crunchin' Crackers" and "Letter of the Day" cookie Products exceed the WHO recommended limit for mg of sodium per 100g of food.

29.    For example, the Crunchin' Crackers contain a whopping 600mg of sodium per 100g of the Products, *12x the 50mg per 100g recommended limit. See* Ex. A. It is not just the high amount of sodium that is too high for a child's developing kidneys, but the density of salt that creates a salty taste profile that will affect children's food preferences for the rest of their lives. Thus, the label claims on the Crunchin' Crackers, including the nutrient content claim "Excellent Source of Iron, Zinc, & Six B Vitamins," the claims that the Products are "wholesome snacks," that "your child will love every nutritious bite," and that the Products will help "start building good habits for life," mislead consumers to believe the products are healthy despite the high sodium content that will harm a young child's health.

30.    Similarly, the Letter of the Day Cookies contain 200mg of sodium per 100g of the Products, also *4x the 50mg per 100g recommended limit.* See Ex. A. Because the high amount of sodium is too high for a child's developing kidneys and the salt density will create a salty taste profile that will affect children's food preferences for the rest of their lives, the Products are not healthy. Thus, the label claims including the nutrient content claim "Excellent Source of Iron, Zinc, & Six B Vitamins," and the description of the cookies as a "nutritious and great tasting

---

[12] WHO 2019, Ending inappropriate promotion; NPPM.
[13] WHO 2019, Ending inappropriate promotion, at 30.

1   way for kids to learn their ABC's" mislead consumers to believe the products are healthy despite

2   the high sodium content that will harm a young child's health.

3   ***The Pouch Format of Pureed Foods Is Not Recommended and Harmful***

4       31.     The DGA recognize that it is not just *what* infants and toddlers are fed, but *how*

5   they are fed, that matters. While some parents begin exposure to solids through the use of purees,

6   purees are not recommended for long-term use because children under two are at a crucial stage

7   of feeding and oral development. Learning to chew and swallow soft foods helps develop speech

8   and multi-sensory experiences that contribute to a palate for a wide range of foods later in life.

9       32.     Indeed, experts have cautioned that relying on pouches like Defendant's Products

10  too much can be a "gateway to bad long-term snacking habits and routine overeating."[14]

11      33.     The World Health Organization has also recognized the dangers inherent in pouch

12  products. Recognizing that "[p]ureeing foods means much of the intrinsic sugar (within cell walls

13  of fruit and vegetables) is liberated and readily available," the WHO—while endorsing the

14  consumption of whole fruits and vegetables—has stated that "pureed foods" "sold in pouches

15  with spouts present[] several issues[,]" including "exposure to high concentrations of free sugars

16  that may quickly be absorbed," "lower nutrient density," and "issues with sucking directly from

17  the pouches," such as "t[oo]th decay" from "sucking these [sugary] foods across the teeth."[15]

18      34.     "In addition, feeding experiences with foods provided in different textures and

19  forms (such as 'finger foods') help to develop manual dexterity, hand-eye coordination, and

20  dexterity of the tongue and other mechanical features involved in chewing and swallowing. The

21  _____

22  [14] *Id.*

23  [15] World Health Organization, "Ending inappropriate promotion of commercially available
    complementary foods for infants and young children between 6 and 36 months in Europe
24  (2019)" available at https://www.euro.who.int/en/health-topics/disease-
    prevention/nutrition/publications/2019/ending-inappropriate-promotion-of-commercially-
25  available-complementary-foods-for-infants-and-young-children-between-6-and-36-months-in-
    europe-2019. (Hereinafter "WHO 2019, Ending inappropriate promotion")

timely introduction and progression of textures helps to support the development of appropriate

feeding and eating behaviors during childhood." 2020 Scientific Report, Part D. Ch. 7.

35.    The WHO cautions that pouches are not recommended because "sucking from a

pouch does not encourage the learning of, and use of, chewing skills; children cannot distinguish

what it is they are eating, and cannot see or smell the food easily; children who are given smooth

foods in pouches for longer periods may become fussier eaters; children develop fine motor

skills when picking up food or playing with it; pureed fruit and vegetables in pouches are high in

free sugars, and sucking these foods across the teeth may contribute to tooth decay; there is no

portion control if food is eaten directly from the pouch; and there may be considerable food

waste."[16]

36.    A baby consuming a pouch is also more likely to eat more puree than when she is

fed with a spoon. This is problematic in at least two ways: 1) babies are less likely to recognize

satiety cues which can contribute to long term health risks; and 2) babies are filling up on purees

which are "not good nutritional substitutes for breastmilk or formula in early life", according to

the chair of the American Academy of Pediatrics' Committee on Nutrition.[17]

37.    Purees should be timebound in the diet of infants and young children. Children

over 12 months should not continue to consume purees. "[W]ith increasing age and the

development of fine and gross motor skills, infants or young children do not need such smooth

foods and can accept greater exposure to textured foods. This further develops chewing ability

and children can become accustomed to home-style and family foods. Furthermore, ongoing

exposure to highly macerated fruits and vegetables in purees increases unnecessary exposure to

liberated sugars in products, presenting issues such as blood glucose rises, oral health and the

---

[16] WHO 2019, Ending inappropriate promotion, at 48.
[17] *Id.*

development of sweet-taste preference. Pureeing also changes food flavor and appearance and may lead to overeating, as foods can rapidly be swallowed without chewing."[18]

38.    Some professionals have noted delays in motor development among kids overly dependent on pouches.[19]

39.    Despite these risks that have been recognized for years, Defendant continues to market its pouch products as being healthy for young children. For example, Defendant advertises its meat-based pouch products with protein claims. But pureeing meat and masking it with peach puree concentrate, as is the case in the chicken casserole pouch, is not how meat should be introduced to young children. It will not allow the child to be exposed to the texture and taste of meat and therefore will lead to a pickier eater who faces future health and diet risks. Further, consuming the pouch will cause the child to eat more than they would otherwise, displacing other recommended sources of nutrition for young children.

### The Products Are Unhealthy, Ultraprocessed Foods

40.  NOVA ("nova classificação" which translates from Portuguese as "new classification") is a food classification system for processed food that was first introduced in 2009.[20] NOVA categorizes all foods and food products into four groups, according to the extent and purpose of food processing, rather than in terms of nutrients: 1) unprocessed or minimally processed food, 2) processed culinary ingredients, 3) processed foods, and 4) ultra-processed food and drink pouches.  NOVA is recognized as a valid tool for nutrition and public health

---

[18] NPPM at 21.

[19] Alice Callahan, "The Truth About Food Pouches," New York Times, April 17, 2020, available at https://www.nytimes.com/2020/04/17/parenting/baby-food-pouches.html.

[20] Monteiro CA. Nutrition and health. The issue is not food, nor nutrients, so much as processing. *Public health nutrition*. 2009 May;12(5):729-31; Monteiro CA, Cannon G, Moubarac JC, Levy RB, Louzada ML, Jaime PC. The UN Decade of Nutrition, the NOVA food classification and the trouble with ultra-processing. *Public Health Nutrition*. 2018 Jan;21(1):5-17; Monteiro CA, Cannon G, Levy RB et al. NOVA. The star shines bright. [Food classification. Public health] World Nutrition January-March 2016, 7, 1-3, 28-38.

research, policy, and action in reports from the UN's FAO and the Pan American Health Organization (PAHO).[21]

41.  Ultra-processed foods are defined as foods that go beyond the incorporation of salt, sugar, and fat to include artificial colors and flavors, preservatives, thickeners, emulsifiers, and artificial sweeteners that promote shelf stability, preserve and enhance texture, and increase palatability. The overall purpose of ultra-processing is to create branded, convenient (durable, ready to consume), attractive (hyper-palatable) and highly profitable (low-cost ingredients) food products designed to displace all other food groups. Ultra-processed food products are usually packaged attractively and marketed intensively.[22]

42.  Sugar, oils and fats, and salt are often ingredients of ultra-processed foods, generally in combination. Additives that prolong product duration, protect original properties and prevent proliferation of micro-organisms may be used in both processed and ultra-processed foods, as well as in processed culinary ingredients, and, infrequently, in minimally processed foods.[23]

43.  Ingredients that are characteristic of ultra-processed foods can be divided into food substances of no or rare culinary use and classes of additives whose function is to make the final product palatable or often hyper-palatable ('cosmetic additives'). Food substances of no or rare culinary use, and used only in the manufacture of ultra-processed foods, include varieties of sugars (fructose, high-fructose corn syrup, 'fruit juice concentrates', invert sugar, maltodextrin, dextrose, lactose), modified oils (hydrogenated or interesterified oils) and protein sources (hydrolysed proteins, soya protein isolate, gluten, casein, whey protein and 'mechanically

---

[21] Processed Foods and Health: https://nutritionsource.hsph.harvard.edu/processed-foods/
[22] The UN Decade of Nutrition, the NOVA food classification and the trouble with ultra-processing. *Public Health Nutrition*. 2018 Jan;21(1):5-17.
[23] Monteiro CA, Cannon G, Levy RB, Moubarac JC, Louzada ML, Rauber F, Khandpur N, Cediel G, Neri D, Martinez-Steele E, Baraldi LG, Jaime PC. Ultra-processed foods: what they are and how to identify them. Public Health Nutr. 2019 Apr;22(5):936-941. doi: 10.1017/S1368980018003762. Epub 2019 Feb 12. PMID: 30744710; PMCID: PMC10260459.

separated meat'). Classes of additives only found in ultra-processed products include dyes and other colors, color stabilizers, flavors, flavor enhancers, non-sugar sweeteners, and processing aids such as carbonating, firming, bulking and anti-bulking, de-foaming, anti-caking and glazing agents, emulsifiers, sequestrants and humectants.[24]

44.　　Ultraprocessed foods typically have high glycemic loads. This makes them liable to disturb and even derange endogenous processes in the nervous system that signal satiety and control appetite, and thus increase the risk of obesity and diabetes.[25]

45.　　The main purpose of industrial ultra-processing is to create products that are ready to eat, to drink or to heat, as an alterantive to unprocessed or minimally processed foods that are naturally ready to consume, such as fruits and nuts, milk and water, and freshly prepared drinks, dishes, desserts and meals. Common attributes of ultra-processed products are hyper-palatability, sophisticated and attractive packaging, multi-media and other aggressive marketing to children and adolescents, health claims, high profitability, and branding and ownership by transnational corporations.[26]

46.　　Examples of typical ultra-processed products are: carbonated drinks; sweet or savory packaged snacks; ice-cream, chocolate, candies (confectionery); mass-produced packaged breads and buns; margarines and spreads; cookies (biscuits), pastries, cakes, and cake mixes; breakfast 'cereals', 'cereal' and 'energy' bars; 'energy' drinks; milk drinks, 'fruit' yoghurts and 'fruit' drinks; cocoa drinks; meat and chicken extracts and 'instant' sauces; infant formulas, follow-on milks, other baby products; 'health' and 'slimming' products such as powdered or 'fortified' meal and dish substitutes; and many ready to heat products including pre-prepared pies and pasta and pizza dishes; poultry and fish 'nuggets' and 'sticks', sausages,

---

[24] *Id.*

[25] *Id.*

[26] Monteiro CA, Cannon G, Levy RB et al. NOVA. The star shines bright. [Food classification. Public health] *World Nutrition* January-March 2016, 7, 1-3, 28-38.

burgers, hot dogs, and other reconstituted meat products, and powdered and packaged 'instant' soups, noodles and desserts. When products made solely of group 1 or group 3 foods also contain cosmetic or sensory intensifying additives, such as plain yoghurt with added artificial sweeteners, and breads with added emulsifiers, they are classified here in group 4.[27]

47.    All of the Products are ultra processed foods that are unhealthy for infants and toddlers.

48.    The Crunchin' Crackers are packaged snacks that are high in sodium and made with gluten, oils, cane sugar, and maltodextrin. They are fortified with vitamins used that Defendant uses to "health-wash" the Products in marketing claims by including nutrient content claims and describing the snacks as "wholesome snacks."

49.    Similarly, the Letter of the Day cookies are made with oils, cane sugar, leavening, salt, and maltodextrin. They are fortified with vitamins that Defendant uses to "health-wash" the Products in marketing by including nutrient content claims and describing the snacks as "nutritious."

50.    The smoothie pouch Products are all processed foods containing juice concentrates to sweeten them. They are shelf stable, despite containing yogurt, indicating they have been highly processed to increase shelf life and therefore profitability. Similar to the other products, they are fortified with vitamins that Defendant uses to "health-wash" the Products in marketing by including nutrient content claims on the labels.

51.    The protein pouch Products are similarly ultraprocessed. They are shelf stable, despite containing meat and other vegetables, indicating they have been highly processed to increase shelf life and therefore profitability. The meat and vegetables no longer resemble their

---

[27] *Id.*

original form or taste. The Chicken Casserole meat pouch also contains peach concentrate, used to sweeten the Product and masking the flavor of the ingredients.

**Defendant Intends to Mislead Consumers to Increase Its Profits**

52.     "The baby food market is being reshaped by the new generation of health-conscious parents who are more discerning about formula ingredients and seek greater transparency from brands," said Wendel Afonso, CEO at Harmony Baby Nutrition. "As a result, brands are compelled to enhance the nutritional profiles and manufacturing practices of their baby food offerings to cater to these evolving consumer demands."[28]

53.     Further, the rise of pouches in the industry has been seemingly unstoppable. "The increasing demand is understandable, as the ease and convenience of pouches can make them irresistible to overworked, stressed parents and caregivers." But, "[t]hese pouches are very worrisome," according to Dr. Mark Corkins, who is chair of the American Academy of Pediatrics Committee on Nutrition.[29]

54.     "Children have to learn to chew, so they should be eating regular fruits, not pureed, sweetened things in a pouch," he said. "Often, these blends are not natural and much sweeter than a real fruit, so the child's being taught to only like supersweet things." Then there is the issue of texture, which must be learned at a critical age.

55.     "We tell parents to gradually increase the texture of the foods during the introduction to real foods between 6 months and a year," Corkins said. "If you don't expose kids

---

[28] https://foodinstitute.com/consumerinsights/consumer-demand-reshaping-baby-food-market/ (last visited Oct. 11, 2024).

[29] https://www.cnn.com/2024/08/21/health/unhealthy-baby-food-study-wellness/index.html (last visited Oct. 11, 2024).

to a variety of textures with more chewing during that critical window, they can develop a texture aversion and will refuse anything but smooth, pureed types of foods."

56.     Seeking to cash in on stressed parents and caregivers' concern for young children's health, Defendant has increasingly used nutrient content claims to compete in the growing market.

57.     According to Defendant, "Parents are looking for toddler foods and snacks with a nutritious and healthy positioning and are willing to pay a substantial price premium for them."[30]

58.     With regards to protein specifically, which Defendant advertises prominently on the front of its pouches, "Parents [are] willing to pay more for protein-heavy meal pouches."[31] Defendant sought to appeal to "paleo parents looking for clean protein solutions," and claimed, contrary to dietary recommendations and guidance, that "the dietary needs of infants and toddlers support serving high protein, [] foods."[32] However, a protein-heavy diet poses risks for a young child's developing kidneys and children under two will meet their protein needs through the recommended sources of nutrients such as breastmilk, formula, and cow's milk.

59.     With regards to the "Crunchin' Crackers," Defendant boasts that the Products have market appeal because "Parents are looking for healthier options and hidden veg[etables] in fun snacks." Children need to experience the taste and texture of the vegetable to come to like

---

[30] *Howard et al., v. Hain Celestial Group, Inc.*, No. 22-cv-00527, ECF 147-4 at 6.
[31] *Howard et al., v. Hain Celestial Group, Inc.*, No. 22-cv-00527, ECF 147-6 at 6.
[32] *Howard et al., v. Hain Celestial Group, Inc.*, No. 22-cv-00527, ECF 147-14 at 21.

it and eat it in the future. Masking vegetables in salty snacks is not healthy and will do little to promote a healthy diet.

**Defendant's Products Are Intended Specifically for Children Under Two**

**Earth's Best is a Leading Baby Food Brand That Sells Baby Food and Toddler Foods Intended Specifically for Children Under Two.**

60. Earth's Best is a baby food brand founded in 1985. According to its website:

From day one, [the founders of Earth's Best] recognized the importance of wholesome, pure nourishment for babies. Embracing fruits handpicked from organic orchards and vegetables cultivated from the earth, Ron Koss and Arnie Koss believed in creating delicious, organic baby food while promoting environmental responsibility.

30 years later, The Hain Celestial Group, Inc. maintains this principle. Now offering a wide range of safe and gentle baby care products as well as nourishing foods, Earth's Best® products are created with care, using pure, simple ingredients found in nature. Made with love from the ground up, you can trust Earth's Best® products to be safe for your baby and safe for the environment.[33]

61. Defendant categorizes its food products on its website into two groups: 1) Infant & Baby Foods; and 2) Toddler Foods. Defendant further categorizes its Infant & Baby Foods into the following subcategories: 1) Organic Infant Cereal; 2) Organic Baby Food Puree Pouches; and 3) Organic Baby Food in Glass Jars. Within the Organic Baby Food Puree Pouch subcategory, Defendant further divides products by age according to "stage." Defendant defines "Stage 2" as 6+ Months. Defendant defines "Stage 3" as 9+ Months.[34]

62. At least four of the Products are labeled as being for children in "Stage 3," which means the products are specifically intended for children "9+ Months" and thus for children under two: the Beef Medley puree pouch; the Chicken Casserole puree pouch; the Veggie Red Lentil Bake protein pouch; and the Four Bean Feast protein pouch.

---

[33] https://www.earthsbest.com/why-earths-best/our-history/
[34] https://www.earthsbest.com/products/category/infant-foods/puree-pouches/

1    63.    Defendant categorizes the remaining Products, which include smoothie pouches,

2  snacks, and cookies, as "Toddler Foods" on its website as seen below.[35]



3    64.    Defendant defines a "toddler" to be a child under two. For example, its Toddler

4  Milk Drink Powder is labeled as being for children "1 & up."[36]

5    65.    The Centers for Disease Control (CDC) defines "toddler" as "1-2 years of age."[37]

6  As the Oxford English dictionary explains, the word "toddler" means "a child who has only

7  recently learnt to walk."[38] According to the CDC, most babies learn to walk between 12-18

8  months, i.e., specifically under two years of age.[39]

9    66.    Defendant is aware that, in the product segment in which it operates (i.e., food

10  for very young children), the word "toddlers" is commonly understood by parent-consumers to

11  mean children under two.

12    67.    Defendant's internal marketing documents and presentations to retailers

13  consistently represented that the Products were intended specifically for children under two.

---

[35] https://www.earthsbest.com/products/category/toddler-foods/
[36] https://www.earthsbest.com/products/category/formula/toddler-formula/
[37] https://www.cdc.gov/ncbddd/childdevelopment/positiveparenting/toddlers.html
[38]
https://www.oxfordlearnersdictionaries.com/us/definition/english/toddler#:~:text=%2F%CB%
88t%C9%92dl%C9%99(r)%2F,only%20recently%20learnt%20to%20walk (last accessed May
23, 2022).
[39]   https://www.cdc.gov/ncbddd/actearly/pdf/checklists/Checklists-with-Tips_Reader_508.pdf
(last accessed May 24, 2022).

Below is an example of a "Birth to Backpack" timeline showing a stage 3 meat pouch and a Sesame Street pouch being for children "9+ months", i.e., all for children under two:



**Earth's Best's Sesame Street Products Are Intended Specifically for Children Under Two, Including Babies and Toddlers**

68.     In 2004, Earth's Best explained in its annual report that it had partnered with Sesame Street to "expand[] its traditional line of *infant and toddler foods* with … Earth's Best Sesame Street products in conjunction with the Sesame Workshop Healthy Habits for Life Initiative." (Emphasis added.)[40]

69.     In announcing the partnership, Irwin Simon, then-CEO of Hain Celestial, described the Products as being specifically intended for both babies and toddlers, saying, "[o]ur Earth's Best organic brand of *baby and toddler products* is proud to be a sponsor of Sesame

---

[40] Hain Celestial Annual Report for 2005, available at https://ir.hain.com/static-files/4f5f47b8-9ab2-424c-aed1-a838780f02c3

(not applicable)

Street and Sesame Workshop's exemplary children's educational programming." (Emphasis added.)[41]

70.    In its 2005 Annual Report (the "Report"), Defendant again confirmed that the Products are intended specifically for infants and toddlers under two stating "Earth's Best expanded its traditional line of *infant and toddler foods* with variety and starter packs as well as Earth's Best Sesame Street products in conjunction with the Sesame Workshop Healthy Habits for Life initiative." (Emphasis added.) The Report also boasted that "Throughout the day, *toddlers* enjoy many healthful options from both our Earth's Best® and Sesame Street® products." (Emphasis added.)[42]

71.    Several of the Earth's Best Products that make nutrient content claims include Sesame Street characters on the label. These Products include, but are not limited to: the Apple Blueberry Fruit Yogurt Smoothie Pouch (featuring Big Bird), the Strawberry Banana Fruit Yogurt Smoothie (featuring Elmo), the Peach Banana Fruit Yogurt Smoothie Pouch (featuring Cookie Monster), the Pear Mango Fruit Yogurt Smoothie Pouch (featuring Oscar the Grouch), the Mixed Berry Fruity Yogurt Smoothie Pouch (featuring Abby), and the Pineapple Orange Banana Fruit Yogurt Smoothie Pouch (featuring Rosita). These Products will be referred to as the "Sesame Street Products."

72.    Sesame Street characters are marketed for babies as young as 0-12 months. For example, below is an Elmo toy designed to attach to an infant's car seat and an Elmo pacifier. The suggested age listed for the products is 0-12 months.[43] Also below are Sesame Street

---

[41]    https://ir.hain.com/news-releases/news-release-details/hain-celestial-group-announces-earths-bestr-sponsorship-sesame (last accessed May 23, 2022)

[42] https://www.annualreports.com/HostedData/AnnualReportArchive/t/NASDAQ_HAIN_2005.pdf (last accessed May 24, 2022).

[43] *See* Bright Starts Sesame Street Soft Elmo Toy Bar, https://www.target.com/p/bright-starts-sesame-street-soft-elmo-toy-bar/-/-A-76152371#lnk=sametab; Bright Starts Sesame Street Cozy Coo Soothing Pacifier, https://www.target.com/p/bright-starts-sesame-street-cozy-coo-soothing-pacifier-elmo/-/-A-76152382

character onesies sized for babies and toddlers ages 0-18 months. Children under two find the colorful, fuzzy characters appealing, regardless of whether they watch the televison show or not.



73.     Defendant's internal marketing documents also confirm its intent to market the Sesame Street Products to children under two. As seen in the image below, when presenting the appeal of the Sesame Street Products at presentations with retailers, Defendant emphasized that Sesame Street characters are two of the top favorite characters for children "0-2 years old"

**Defendant's Advertising and Marketing Confirms the Products Are Specifically Intended for Babies & Toddlers Under Two**

74.     Defendant knows that babies and toddlers less than two years of age are attracted to Defendant's Products that feature Sesame Street characters and it emphasizes the appeal of the Products for these young children in its marketing.

75.     For example, Defendant's social media marketing confirms that the Products are intended specifically for babies and toddlers under two and marketed to parents of children under the age of two. For example, the below post from Earth's Best appeared on its Instagram page on June 26, 2019. The post includes a picture of one of the Sesame Street Products at issue, along with the caption "Snack-ready Earth's Best Fruit Yogurt Smoothie pouches? [check] SPF? [check] ***Baby's*** best beach day? [check]" (emphasis added).

- 24 -

1
2
3
4
5
6
7
8
9
10
11
12



76.     Another photo from Earth's Best Instagram account from June 12, 2015, features the same Product at issue in this case with the same claims, being held by a baby evidently well under the age of two with the caption "Baby of the Week" and "Our #Babyoftheweek is very serious about his smoothie pouch."

13
14
15
16
17
18
19
20



21
22
23
24
25

77.     Defendant features the Products at issue in its social media posts and includes hashtags to draw consumers to its Products. Repeatedly, and for at least the past five years, the Products are featured with the hashtags "#babyfood," "#baby" and "#toddler." Below is a sample of recent Facebook posts encouraging consumers to purchase the Products for their babies under the age of two in the captions and hashtags.



**Consumers Understand that Defendant Intended Specifically that the Products Be Purchased for Children Under the Age of Two**

78.     Defendant features consumer reviews on its website for each of the Products. Several of the reviews show that consumers understand Defendant's intent that the Products be purchased for children under the age of two.

79.     Moreover, some of the reviews are from persons who "received free product," indicating that Defendant sent the Product to the parent of a child under the age of two.

80.    Defendant's feature of these reviews also further confirms that it intends specifically that the Products be consumed by children under the age of two.

81.    For example, the below review is featured on Defendant's webpage for the Apple Blueberry Fruit Yogurt Smoothie, wherein the user indicates she received free product and fed the Product to her baby when the baby began to crawl (which occurs well before the age of 2):



82.    On Defendant's webpage featuring the Vanilla Letter of the Day Cookies, the below review is featured, indicating the consumer received free product and purchases the Product for her one-year-old who "loves the cookie monster and Elmo. As soon as she spotted the box with their pics she wanted some cookies!"



**<u>Defendant's Product Labels Confirm the Products Are Intended Specifically for Children Under the Age of Two.</u>**

83.     Four of the pouch products feature protein nutrient content claims such as "3g Protein." (The "Protein Pouches"). As seen below, the Protein Pouches are "Stage 3" pouches. Defendant's website defines Stage 3 as being for babies "9 months and older."[44]



84.     Below is an online advertisement that similarly confirms the Protein Pouches are "Stage 3" pouches and are therefore intended for children under two.



85.     The snack and cookie Products, including the Organic Crunchin' Crackers and the Organic Letter of the Day Cookies, include the following instructions on the side panel of

_____

[44] https://www.earthsbest.com/products/category/infant-foods/puree-pouches/9months-puree-pouches-infant-foods/

the package for the age of babies and toddlers for which the Products are intended: "This product should be fed to toddlers only when they have the ability to chew solid foods."



86.    According to the CDC, children have the ability to eat solid foods by the time the child is seven or eight months, i.e., well under the age of two.[45]

87.    According to Defendant's own website, at 6-9 Months a "baby can also chew using up and down motions and move food around in her mouth."[46]

**Defendant Sells its Products in the Baby Food Aisle of Retailers**

88.    Defendant controls where the Products are placed in the grocery store, and specifically intends the Products be placed in the baby food aisle so that the Products will be marketed to and purchased by parents of children under the age of two.

89.    For example, Defendant pays fees to ensure certain placement of the Products within the baby foods section of the store as a part of its marketing scheme. As Defendant explained in its June 30, 2021 10-K, it counts store shelf product "placement fees" among its

---

[45] https://www.cdc.gov/nutrition/infantandtoddlernutrition/foods-and-drinks/when-to-introduce-solid-foods.html#:~:text=The%20American%20Academy%20of%20Pediatrics%20says%20that%20for%20most%20children,foods%20from%20different%20food%20groups.
[46] https://www.earthsbest.com/parents/resources/infant-feeding-schedule/

1  marketing costs.[47]

2      90.    On information and belief, retail stores set criteria for foods to be placed in the

3  baby food aisle, including grouping products by the ages for which the products are intended.

4  As seen below, the Products are sold alongside other baby food pouch products that are intended

5  for children as young as 6 months. In the photo of the pouch products, the Earth's Best "Apple

6  Peach Oatmeal" pouch directly adjacent to the Products at issue (with photos of Cookie Monster,

7  Elmo, and Big Bird) states on the front label "6+ Months." The Earth's Best products directly

8  above the Products at issue similarly include "6+ Months" on the front label.

 

20      91.    Similarly, consumers shopping online for the Products will find the Products

21  described as "baby food" and within the Baby Food section of online retailers. On information

22  and belief, Defendant specifically requests that major online retailers categorize the Products in

23

24  —————————————

25  [47] Hain Celestial SEC 10-K for Fiscal Year Ending on June 30, 2021, available at https://ir.hain.com/static-files/438669fd-7c4a-4557-ad87-06b788187879 (last accessed May 23, 2022) (placement fees included in marketing costs).

1  the baby food category. Below is an example of one of the Products on both the Kroger shopping

2  app and the Target website. The Kroger app describes the Product as "Baby Food" and the Target

3  website shows the Product categorized as Target / Baby / Nursing & Feeding / Baby Food.

4  
5  
6  
7  
8  
9  
10  
11  
12  
13  

14  
### <u>Defendant's Disclaimer Does Not Establish the Products Are Intended for Children Over the Age of Two</u>

15  
16  92.    At least some of the Products include the language "For ages 2 and up," or a

17  similar statement, in small font above the nutrition facts panel **on the back label** of the Product

18  as shown below:

19  
20  
21  
22  
23  
24  
25



93.     The disclaimer does not negate the fact that the Products are intended specifically for children under two. Put differently, it does not rebut Defendant's internal marketing documents that show Defendant intended to sell the Products for children under two.

94.     None of the Products have any statement on the front label that the products are only for children older than two. Nor do any of the Products have any asterisk or other indication in proximity to the unlawful nutrient content claims on the front label (i.e, the claim such as "4g PROTEIN per serving" or "Excellent source of Iron, Zinc, & six B vitamins") to alert consumers to view the disclaimer on the back and to understand that this claim is made only for purchases to feed children age two and over.

95.     The disclaimer on the back of the Products is not even clear as to what it means: does it mean that the Product itself is only for those "ages 2+"? Or does it mean that the statements in the nutrition facts panel immediately below the disclaimers apply only for those in that age group?

96.     Consumers rely on the front label and product placement when determining whether a product is appropriate for their child under the age of two. Reviews featured on

Defendant's website confirm that the disclaimer does not communicate that the Products are intended specifically "For ages 2+."

97.    For example, the below review is featured on Defendant's webpage for the Veggie Red Lentil Bake Protein Puree Pouch:



**Defendant Markets Its Products with Unlawful Nutrient Content Claims**

98.    There is seemingly no limit to the combination of foods that can go into baby food pouches, as evidenced by the wide and growing array of flavors of the Products. Looking for a way to differentiate itself in the growing market, Defendant has turned to making nutrient content claims on the front of the Product labels.

99.    For example, one of the Product lines are baby food pouches called "Organic Fruit Yogurt Smoothies" that state on the front label, "Excellent source of Calcium, Vitamins C & D." An exemplar is shown below.



100.    Another line of the Products are pouches called "Earth's Best Protein Pouches," which state on the front label "3g Plant Protein."



101.    Additionally, another Product line at issue are snacks called "The Organic Crunchin' Crackers," which similarly claim, "Excellent source of Iron, Zinc, & Six B Vitamins."

1

2

3

4

5

6

7

8

9

10

11

 

12    102.    Defendant's advertising and labeling of the Products with nutrient content claims

13  is unlawful because the Products are intended for children under two.

14                    **Federal and State Regulations Governing Food Labeling**

15    103.    The Food and Drug Administration regulates nutrition content labeling.

16  According to these regulations, "no nutrient content claims may be made on food intended

17  specifically for use by infants and children less than 2 years of age," subject to certain exceptions

18  not applicable here. 21 C.F.R. § 101.13(b)(3).

19    104.    In so enacting this regulation, the FDA stated that "toddlers" include children

20  under the age of two. *See* 56 Fed. Reg. 60421 (proposed rule stating "FDA is proposing in §

21  101.13(a) that nutrient content claims may not be made on foods intended specifically for use by

22  infants and toddlers less then 2 years of age.").

23    105.    According to the regulations, nutrient content claims can be expressed or implied.

24  21 C.F.R. § 101.13(b)(1), 21 C.F.R. § 101.13(b)(2).

25

106.    An express nutrient content claim is "any direct statement about the level (or range) of a nutrient in the food." 21 C.F.R. § 101.13(b)(1). Further, where information that is required or permitted to be "declared in nutrition labeling, and that appears as part of the nutrition label . . . is declared elsewhere on the label or in labeling, it is a nutrient content claim and is subject to the requirements for nutrient content claims." 21 C.F.R. § 101.13(c).

107.    Identical federal and California laws regulate the content of labels on packaged food and require truthful, accurate information on the labels of packaged foods. The requirements of the federal Food, Drug & Cosmetic Act ("FDCA"), and its labeling regulations, including those set forth in 21 C.F.R. § 101, were adopted by the California legislature in the Sherman Food Drug & Cosmetic Law (the "Sherman Law"). California Health & Safety Code § 110100 ("All food labeling regulations and any amendments to those regulations adopted pursuant to the federal act, in effect on January 1, 1993, or adopted on or after that date shall be the food labeling regulations of this state."). The federal laws and regulations discussed herein are applicable nationwide to all sales of packaged food products. Additionally, no state imposes different requirements on labeling of packaged food for sale in the United States.

108.    Under California law, a food product that is "misbranded" cannot legally be manufactured, advertised, distributed, sold, or possessed. Misbranded products have no economic value and are legally worthless.

109.    Representing that the Products will provide certain health benefits by making unlawful nutrient content claims as Defendant's labels do is prohibited by the aforementioned laws and regulations.

**FDA Guidance and Enforcement of the Prohibition of Nutrient Content Claims on Food Intended Specifically for Children Under the Age of Two**

110.    The FDA has interpreted this regulation in a warning letter sent to Gerber in 2010 (the "Gerber Warning Letter"), attached hereto as Exhibit B. In that letter the FDA determined that Gerber's products were intended specifically for children under two based on statements on

the product labels indicating the products were for children who had achieved age-related physical milestones that typically occur before the age of two. In the letter, the FDA stated:

> This product is [] intended specifically for infants and children under the age of two. For example, its labeling states that the product is appropriate for a "sitter," and sitting is a developmental milestone that generally occurs by the age of one.

In other words, the FDA determined that a products labelled for a "sitter" is "intended specifically" for children under age two under the regulations, even though children (and adults) continue to be "sitters" for many years thereafter. *See* Exhibit B.

111.    Under the FDA's interpretation, Defendant's Products violate the regulations for the same reasons. Defendant's use developmental milestones like being able to chew solid foods, which is reached around nine months, and words that specifically relate to children under the age of two like "toddler", "9+ months", or "stage 3" (which Defendant defines as "9+ months") on the label of the Products. Even if these categories arguably also include children older than two, just as "sitter" could include older children and adults, the Products are "intended specifically" for children under two within the meaning of the regulations as interpreted by the FDA.

112.    Similarly, many of Defendant's Products include "excellent source" claims that the FDA concluded are not permitted on labels of food products intended for children under two.

**Defendant's Marketing and Labeling of the Products Violates State and Federal Food Labeling Laws**

**The Products Are Unlawfully Labeled.**

113.    The Products are unlawful, misbranded, and violate the Sherman Law, California Health & Safety Code § 110660, *et seq.*, because the Products are intended specifically for children less than two years of age and the Products' labels contain express nutrient content claims.

1    114.    The Products at issue in this case are intended specifically for children under two

2    years of age.

3    115.    As detailed above, the Products are marketed to babies and toddlers under the age

4    of two both on Defendant's website and social media. Some Products are labeled on the front

5    label as "Stage 3" which, by Defendant's definition, is children nine months and older. The snack

6    and cookie Products include on the label an instruction that the Product be fed to children that

7    can chew solid food, which by Defendant's definition includes babies as young as 6-9 months.

8    The Products feature Sesame Street characters that are marketed to children as young as 0-12

9    months. Defendant intentionally has the Products placed in the "Baby Food" aisles of grocery

10   stores and the "Baby Food" sections of grocery websites, alongside similar pureed pouch

11   products and other first solids intended for children as young as six months.

12   116.    As detailed above, Defendant's internal marketing documents also confirm that

13   it intended the Products be purchased for children under the age of two. It used Sesame Street

14   characters to appeal to children 0-2 years old because the characters are among the most popular

15   characters for that age group. Defendant consistently represented to retailers that all of the

16   Product lines were intended for children under two using timelines that show the Products were

17   intended for children as young as 9 months.

18   117.    Defendant misbrands the Products by making nutrient content claims that are

19   prohibited by the FDA.

20   118.    All the Product labels contain impermissible nutrient content claims. As shown

21   in **Exhibit A**, the Product labels prominently state nutrient content claims such as "Excellent

22   Source of Calcium, Vitamin C & D" or "3g of Protein."

23   119.    Claims using "excellent source" are nutrient content claims. 21 C.F.R. §

24   101.54(b).

25

120.    Claims that state the grams of protein on the front label are express statements of the level of a nutrient and are thus nutrient content claims. Further, because the grams of protein appear in the nutrition facts panel, they are therefore nutrient content claims when stated elsewhere on the label. 21 C.F.R. § 101.13(c).

121.    Foods intended for children less than two are prohibited from making such nutrient content claims. 21 C.F.R. § 101.13(b)(3). Therefore, the Products are accordingly misbranded.

122.    The FDA has acted twice to enforce these regulations through warning letters it sent to Gerber and Beech-Nut regarding their baby food products that were labeled with "excellent source" and "good source" claims.

123.    The products at issue in the Gerber Warning Letter were "Fruit Puffs" and a jar of pureed carrots ("2nd Foods Carrots"). The Fruit Puffs made a claim "good source of iron, zinc, and Vitamin E for infants and toddlers." The 2nd Foods Carrots made the claim "Excellent Source of Vitamin A." The FDA concluded that neither product was permitted to include a "good source" or "excellent source" claim because the "regulations do not allow the claim for products specifically intended for children under two years of age." *See* Exhibit B.

124.    Similarly, the FDA issued a warning letter to Beech-Nut Nutrition Corporation (the "Beech-Nut Letter") regarding Beech-Nut oatmeal and cereal products intended for children under two. The products included, *inter alia*, the claim "Excellent source of iron, vitamin D, calcium, zinc, 7 B-vitamins." The FDA concluded that 21 C.F.R. § 101.54(b) governs the circumstances under which an "excellent source" claim is permitted and that the regulation does "not allow these claims for products intended for infants and children under age 2 years of age." *See* Exhibit C.

1   125. Defendant's Products are therefore prohibited from making "excellent source"

2 claims because the regulation governing "excellent source" claims does not allow for the claim

3 on products intended for children under two. 21 C.F.R. § 101.54(b); Exhibits B, C.

4   126. For the reasons stated herein, Defendant's marketing of the Products is

5 misleading and unlawful. Defendant's labeling of the Products as providing physical health

6 benefits for babies and toddlers being a healthful and safe source of nutrients for babies and

7 toddlers is misleading to reasonable consumers. The labels take advantage of parents' and

8 caregivers' desires to give infants and young children nutritious food with the advertised

9 vitamins, minerals, and macronutrients, leading them to believe the products are healthy,

10 children need more of the advertised nutritional content, and distracting consumers from the

11 undesirable nutritional qualities of the Products. The Products are actually harmful for children

12 under two both nutritionally and developmentally because of the sugar content, the pouch format,

13 and the sodium content of the foods.

14   127. Defendant's marketing, advertising, and sale of the Products violates the false

15 advertising provisions of the Sherman Law (California Health & Safety Code § 110390, *et.*

16 *seq.*), including but not limited to:

17   a. Section 110390, which makes it unlawful to disseminate false or misleading

18 food advertisements that include statements on products and product packaging or labeling or

19 any other medium used to directly or indirectly induce the purchase of a food product;

20

21   b. Section 110395, which makes it unlawful to manufacture, sell, deliver, hold, or

22 offer to sell any falsely or misleadingly advertised food; and

23   c. Sections 110398 and 110400, which make it unlawful to advertise misbranded

24 food or to deliver or proffer for delivery any food that has been falsely or misleadingly

25 advertised.

1

2

3

 d. Defendant's marketing, advertising, and sale of the Products violates the misbranding provisions of the Sherman Law (California Health & Safety Code § 110660, *et. seq.*), including but not limited to:

4

5

 e. Section 110665 (a food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in 21 U.S.C. Sec. 343(q));

6

7

8

 f. Section 110760, which makes it unlawful for any person to manufacture, sell, deliver, hold, or offer for sale any food that is misbranded;

9

10

 g. Section 110765, which makes it unlawful for any person to misbrand any food; and

11

12

 h. Section 110770, which makes it unlawful for any person to receive in commerce any food that is misbranded or to deliver or proffer for delivery any such food.

13

14

15

16

17

 128. Defendant has violated 21 U.S.C. § 343(a), and the standards set by FDA regulations, including, but not limited to, 21 C.F.R. §§ 101.13(b), and 101.13(c), which have been incorporated by reference in the Sherman Law, by including impermissible nutrient content claims on the labels of foods intended for children less than 2 years of age, and including misleading claims on the labels.

18

19

20

21

22

 129. A reasonable consumer would rely on the label claims to decide to purchase the Products. For example, Defendant's nutrient content claims mislead a reasonable consumer to believe the Products provide physical health benefits for a child under two when in fact, the Products are harmful for children under two both nutritionally and developmentally.

23

24

25

 130. Defendant intends for and knows that consumers will and do rely upon food labeling statements in making their purchasing decisions. Label claims and other forms of advertising and marketing drive product sales, particularly if placed prominently on the front of

product packaging, as Defendant has done on the Product labels.

131.    Because consumers pay a price premium for Products that have a nutrient content claim, by labeling the Products as providing nutritional value, Defendant is able to both increase its sales and retain more profits.

132.    Defendant engaged in the practices complained of herein to further its private interests of: (i) increasing sales of its Products while decreasing the sales of competitors' products that do not make unlawful nutrient content claims, and/or (ii) commanding a higher price for the Products because consumers will pay more for them due to consumers' demand for healthful products for their children.

133.    The market for baby food pouch products continues to grow, and because Defendant knows consumers rely on the nutrient content claims on the Product labels, Defendant has an incentive to continue to make such misleading and unlawful representations.

134.    Defendant continues to launch new product lines with nutrient content claims to maintain its competitive edge, making it likely that Defendant will continue to misleadingly advertise its Products.

## PLAINTIFF'S EXPERIENCES

### Scott Pflaumer

135.    Beginning in or around February 2023, Mr. Pflaumer purchased several Earth's Best Organic food pouches for his child starting when his child was under two years of age, including each of the following varieties: the Beef Medley Protein Pouch, the Chicken Casserole Protein Pouch, and the Vanilla Organic Letter of the Day Cookies. He purchased the products from his local Walmart and Target stores in San Jose, California.

136.    Mr. Pflaumer made each of his purchases after reading the nutrient content claims on the product labels, including, for example, "Excellent Source of Iron, Zinc, & Six B

Vitamins." Based on the nutrient content claims, Mr. Pflaumer believed the Products were healthy and recommended sources of nutrition for his young child.

137.    As a result of Defendant's unlawful nutrient content claims, the Products have no, or at a minimum, a much lower value to Mr. Pflaumer.

138.    Mr. Pflaumer not only purchased the Products because of the labels' nutrient content claims, but he also paid more money for the Products than he would have paid for them if they did not contain nutrient content claims.

139.    Had Defendant not unlawfully labeled its Products, Mr. Pflaumer would not have purchased them or, at a very minimum, he would have paid less for the Products.

## **CLASS ALLEGATIONS**

140.    Plaintiff brings this class action lawsuit on behalf of himself and a proposed class of similarly situated persons, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure. Plaintiff seeks to represent the following groups of similarly situated persons, defined as follows:

Class:                          All persons who purchased the Products for children under two between November 8, 2020 and the present.

141.    This action has been brought and may properly be maintained as a class action against Defendant because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

142.    Numerosity: Plaintiff does not know the exact size the Class, but he estimates that it is composed of more than 100 persons. The persons in the Class are so numerous that the joinder of all such persons is impracticable and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the courts.

143.    Common Questions Predominate: This action involves common questions of law and fact to the Class because each class member's claim derives from the deceptive, unlawful

and/or unfair statements and omissions that led them to rely on the unlawful nutrient content claims on the Product labels. The common questions of law and fact predominate over individual questions, as proof of a common or single set of facts will establish the right of each member of the Class to recover. The questions of law and fact common to the Class are:

a.    Whether the marketing, advertising, packaging, labeling, and other promotional materials for the Products are deceptive and/or unlawful;

b.    Whether Defendant's actions violate Federal and California laws invoked herein;

c.    Whether labeling the Products with unlawful nutrient content claims causes the Products to command a price premium in the market as compared with similar products that do not make such unlawful claims;

d.    Whether Defendant's advertising and marketing regarding the Products was likely to deceive reasonable consumers;

e.    Whether representations regarding the nutrient content of the Products are material to a reasonable consumer;

f.    Whether Defendant engaged in the behavior knowingly, recklessly, or negligently;

g.    The amount of profits and revenues earned by Defendant as a result of the conduct;

h.    Whether Class members are entitled to restitution and other equitable relief and, if so, what is the nature (and amount) of such relief; and

i.    Whether Class members are entitled to payment of actual, incidental, consequential, exemplary and/or statutory damages plus interest thereon, and if so, what is the nature of such relief.

144.    Typicality: Plaintiff's claims are typical of the claims of the other members of the Class because, among other things, all such claims arise out of the same wrongful course of conduct engaged in by Defendant in violation of law as complained of herein. Further, the

damages of each member of the Class were caused directly by Defendant's wrongful conduct in violation of the law as alleged herein.

145.    Adequacy of Representation: Plaintiff will fairly and adequately protect the interests of all Class members because it is in his best interests to prosecute the claims alleged herein to obtain full compensation due to them for the unfair and illegal conduct of which they complain. Plaintiff also has no interests that are in conflict with, or antagonistic to, the interests of class members. Plaintiff has retained highly competent and experienced class action attorneys to represent their interests and that of the Class. By prevailing on their own claims, Plaintiff will establish Defendant's liability to all class members. Plaintiff and his counsel have the necessary financial resources to adequately and vigorously litigate this class action, and Plaintiff and counsel are aware of their fiduciary responsibilities to the class members and are determined to diligently discharge those duties by vigorously seeking the maximum possible recovery for class members.

146.    Superiority: There is no plain, speedy, or adequate remedy other than by maintenance of this class action. The prosecution of individual remedies by members of the class will tend to establish inconsistent standards of conduct for Defendant and result in the impairment of class members' rights and the disposition of their interests through actions to which they were not parties. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. Furthermore, as the damages suffered by each individual member of the class may be relatively small, the expenses and burden of individual litigation would make it difficult or impossible for individual members of the class to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action.

147.    Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

**CAUSES OF ACTION**

148.    Plaintiff does not plead, and hereby disclaims, causes of action under the FDCA and regulations promulgated thereunder by the FDA. Plaintiff relies on the FDCA and FDA regulations only to the extent such laws and regulations have been separately enacted as state law or regulation or provide a predicate basis of liability under the state and common laws cited in the following causes of action.

**PLAINTIFF'S FIRST CAUSE OF ACTION**
**(Violation of the Consumers Legal Remedies Act (the "CLRA"), California Civil Code § 1750, *et seq.*)**
**On Behalf of Himself and the Class**

149.    Plaintiff realleges and incorporates the paragraphs of this Class Action Complaint as if set forth herein.

150.    Plaintiff and other Class members are "consumers" as that term is defined by the CLRA in California Civil Code § 1761(d).

151.    The Products that Plaintiff (and Class members) purchased from Defendant were "goods" within the meaning of California Civil Code § 1761(a).

152.    Defendant's actions, representations and conduct have violated, and continue to violate the CLRA, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

153.    Defendant's acts and practices, set forth in this Class Action Complaint, led Plaintiff and Class members to falsely believe that the Products provide physical health benefits for their child and/or grandchild when in fact, the Products are harmful for children under two both nutritionally and developmentally. By engaging in the actions, representations and conduct set forth in this Class Action Complaint, Defendant has violated, and continue to violate, § 1770(a)(2), § 1770(a)(5), § 1770(a)(7), and § 1770(a)(8) of the CLRA. In violation of California Civil Code §1770(a)(2), Defendant's acts and practices constitute improper representations regarding the source, sponsorship, approval, or certification of the goods they sold. In violation

of California Civil Code §1770(a)(5), Defendant's acts and practices constitute improper representations that the goods they sell have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities, which they do not have. In violation of California Civil Code §1770(a)(7), Defendant's acts and practices constitute improper representations that the goods it sells are of a particular standard, quality, or grade, when they are of another. In violation of California Civil Code §1770(a)(8), Defendant has disparaged the goods, services, or business of another by false or misleading representation of fact.

154.    Defendant was provided with notice and demand that Defendant correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein. Despite receiving the aforementioned notice and demand, Defendant failed to do so in that, among other things, it failed to identify similarly situated customers, notify them of their right to correction, repair, replacement or other remedy, and/or to provide that remedy. Accordingly, Plaintiff seeks, pursuant to California Civil Code § 1780(a)(3), on behalf of himself and Class members, compensatory damages, punitive damages and restitution of any ill-gotten gains due to Defendant's acts and practices.

155.    Plaintiff also requests that this Court award him costs and reasonable attorneys' fees pursuant to California Civil Code § 1780(d).

### PLAINTIFF'S SECOND CAUSE OF ACTION

**(False Advertising, Business and Professions Code § 17500, *et seq.* ("FAL"))**
**On Behalf of Himself and the Class**

156.    Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

157.    Beginning at an exact date unknown to Plaintiff, but within three (3) years preceding the filing of the Class Action Complaint, Defendant made untrue, false, deceptive and/or misleading statements in connection with the advertising and marketing of the Products.

158.    Defendant made representations and statements (by omission and commission) that led reasonable customers to believe that the Products that they were purchasing were healthy for their young children.

159.    Plaintiff and Class members relied to their detriment on Defendant's misleading and deceptive advertising and marketing practices, including each of the unlawful and deceptive claims set forth above and the attached Exhibit A. Had Plaintiff and Class members been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation, refraining from purchasing the Products or paying less for them.

160.    Defendant's acts and omissions are likely to deceive reasonable consumers and the general public.

161.    Defendant engaged in these false, misleading and deceptive advertising and marketing practices to increase its profits. Accordingly, Defendant has engaged in false advertising, as defined and prohibited by section 17500, *et seq.* of the California Business and Professions Code.

162.    The aforementioned practices, which Defendant used, and continue to use, to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

163.    As a direct and proximate result of such actions, Plaintiff and the other Class members have suffered, and continue to suffer, injury in fact and have lost money and/or property as a result of such false, deceptive and misleading advertising in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. In particular, Plaintiff and Class members, paid a price premium for the Products, i.e., the difference between the price consumers paid for the Products and the price that they would have paid but for Defendant's false, deceptive and misleading advertising. This premium can be determined by using econometric or statistical techniques such as hedonic regression or conjoint analysis. Alternatively, Plaintiff and

Class members will seek a full refund of the price paid upon proof that the sale of the Products was unlawful.

164.   Plaintiff seeks equitable relief, including restitution, with respect to his FAL claims. Pursuant to Federal Rule of Civil Procedure 8(d)(2), Plaintiff makes the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action will not succeed. Plaintiff and the Class may be unable to obtain monetary relief directly under other causes of action and will lack an adequate remedy at law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the FAL, because Plaintiff may not be able to establish each Class member's individualized understanding of Defendant's misleading representations as described in this Complaint, but the FAL does not require individualize proof of deception or injury by absent class members. *See, e.g., Ries v. Ariz. Bevs. USA LLC*, 287 F.R.D. 523, 537 (N.D. Cal. 2012) ("restitutionary relief under the UCL and FAL 'is available without individualized proof of deception, reliance, and injury.'"). In addition, Plaintiff and the Class may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiff is unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the FAL imposes no such *mens rea* requirement and liability exists even if Defendant acted in good faith.

165.   Plaintiff seeks, on behalf of himself and Class members, a declaration that the above-described practices constitute false, misleading and deceptive advertising.

## **PLAINTIFF'S THIRD CAUSE OF ACTION**

### **(Common Law Fraud, Deceit and/or Misrepresentation)**
### **On Behalf of Himself and the Class**

166.   Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

167.    Defendant has fraudulently and deceptively included unlawful nutrient content claims on the Product labels.

168.    The unlawfulness and deceptiveness of the claims was known exclusively to, and actively concealed by, Defendant, not reasonably known to Plaintiff, and material at the time they were made. Defendant's unlawful statements concerned material facts that were essential to the analysis undertaken by Plaintiff as to whether to purchase the Products. In misleading Plaintiff and not so informing him, Defendant breached its duty to Plaintiff. Defendant also gained financially from, and as a result of, its breach.

169.    Plaintiff and Class members relied to their detriment on Defendant's unlawful representations. Had Plaintiff and Class members been adequately informed and not intentionally deceived by Defendant, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of them, or (iii) paying less for the Products.

170.    By and through such fraud, deceit, and unlawful representations, Defendant intended to induce Plaintiff and the Class to alter their position to their detriment. Specifically, Defendant fraudulently and deceptively induced Plaintiff and Class members to, without limitation, purchase the Products.

171.    Plaintiff and Class members justifiably and reasonably relied on Defendant's unlawful representations, and, accordingly, were damaged by Defendant.

172.    As a direct and proximate result of Defendant's unlawful representations, Plaintiff and the Class have suffered damages, including, without limitation, the amount they paid for the Products.

173.    Defendant's conduct as described herein was wilful and malicious and was designed to maximize Defendant's profits even though Defendant knew that it would cause loss and harm to Plaintiff and the Class.

**PLAINTIFF'S FOURTH CAUSE OF ACTION**

**(Unlawful, unfair, and fraudulent trade practices violation of Business and Professions Code § 17200, *et seq.*)**
**On Behalf of Himself and the Class**

174.    Plaintiff realleges and incorporates by reference the paragraphs of this Class Action Complaint as if set forth herein.

175.    Within four (4) years preceding the filing of this lawsuit, and at all times mentioned herein, Defendant has engaged, and continue to engage, in unlawful, unfair, and fraudulent trade practices in California by engaging in the conduct outlined in this Complaint.

176.    Defendant has engaged, and continue to engage, in unfair practices as described herein, in violation of the Unfair Competition Law, California Business & Professions Code §§ 17200 *et seq.* (the "UCL"), by, without limitation, including unlawful nutrient content claims on the Product labels, and thereby selling Products that were not capable of being sold or held legally and which were legally worthless.

177.    Defendant has engaged, and continue to engage, in unlawful practices as described herein, in violation of the UCL, by, without limitation, violating the following laws: (i) the CLRA as described herein; (ii) the FAL as described herein; (iii) the advertising provisions of the Sherman Law (Article 3), including without limitation, California Health & Safety Code §§ 110390, 110395, 110398 and 110400; (iv) the misbranded food provisions of the Sherman Law (Article 6), including without limitation, California Health & Safety Code §§ 110665, 110760, 110765, and 110770; and (v) and federal laws regulating the advertising and branding of food in 21 U.S.C. § 343, *et seq.* and FDA regulations, including but not limited to 21 C.F.R. §§ 101.13(b), and 101.13(c), which are incorporated into the Sherman Law (California Health & Safety Code §§ 110100(a), 110380, and 110505).

178.    Defendant has engaged, and continue to engage, in fraudulent practices as described herein, in violation of the UCL, by, without limitation, including deceptive nutrient content claims and other labelling claims on the Product labels that misled consumers and thereby

selling Products that were not capable of being sold or held legally and which were legally worthless.

179.   Plaintiff and Class members relied to their detriment on Defendant's unlawful, unfair, and fraudulent business practices. Had Plaintiff and Class members been adequately informed and not deceived by Defendant, they would have acted differently by, without limitation: (i) declining to purchase the Products, (ii) purchasing less of the Products, or (iii) paying less for the Products.

180.   Defendant's acts and omissions are likely to deceive the general public.

181.   Defendant engaged in these deceptive and unlawful practices to increase its profits. Accordingly, Defendant has engaged in unlawful trade practices, as defined and prohibited by section 17200, *et seq.* of the California Business and Professions Code.

182.   The aforementioned practices, which Defendant has used to its significant financial gain, also constitute unlawful competition and provide an unlawful advantage over Defendant's competitors as well as injury to the general public.

183.   As a direct and proximate result of such actions, Plaintiff and the other Class members, have suffered and continue to suffer injury in fact and have lost money and/or property as a result of such deceptive and/or unlawful trade practices and unfair competition in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court. In particular, Plaintiff and Class members paid a price premium for the Products, i.e., the difference between the price consumers paid for the Products and the price that they would have paid but for Defendant's misrepresentation. This premium can be determined by using econometric or statistical techniques such as hedonic regression or conjoint analysis. Alternatively, Plaintiff and the Class will seek a full refund of the price paid upon proof that the sale of the Products was unlawful.

184.    As a direct and proximate result of such actions, Defendant has enjoyed, and continue to enjoy, significant financial gain in an amount which will be proven at trial, but which is in excess of the jurisdictional minimum of this Court.

185.    Plaintiff seeks, on behalf of himself and the Class, equitable relief, including restitution for the premium and/or the full price that he and others paid to Defendant as result of Defendant's conduct. Plaintiff and the Class lack an adequate remedy at law to obtain such relief with respect to their "unfairness" claims in this UCL cause of action, because there is no cause of action at law for "unfair" conduct. Plaintiff and the Class similarly lack an adequate remedy at law to obtain such relief with respect to their "unlawfulness" claims in this UCL cause of action because the Sherman Law (Articles 3 and 6) and the Federal laws and regulations referenced herein do not provide a direct cause of action, so Plaintiff and the Class must allege those violations as predicate acts under the UCL to obtain relief.

186.    Plaintiff also seeks equitable relief, including restitution, with respect to their UCL unlawfulness claims for violations of the CLRA, FAL and their UCL "fraudulent" claims. Pursuant to Federal Rule of Civil Procedure 8(d)(2), Plaintiff makes the following allegations in this paragraph only hypothetically and as an alternative to any contrary allegations in their other causes of action, in the event that such causes of action do not succeed. Plaintiff and the Class may be unable to obtain monetary relief directly under other causes of action and will lack an adequate remedy of law, if the Court requires them to show classwide reliance and materiality beyond the objective reasonable consumer standard applied under the UCL, because Plaintiff may not be able to establish each Class member's individualized understanding of Defendant's misleading representations as described in this Complaint, but the UCL does not require individualized proof of deception or injury by absent class members. *See, e.g., Stearns v Ticketmaster*, 655 F.3d 1013, 1020, 1023-25 (distinguishing, for purposes of CLRA claim, among class members for whom website representations may have been materially deficient, but

requiring certification of UCL claim for entire class). In addition, Plaintiff and the Class may be unable to obtain such relief under other causes of action and will lack an adequate remedy at law, if Plaintiff is unable to demonstrate the requisite *mens rea* (intent, reckless, and/or negligence), because the UCL imposes no such *mens rea* requirement and liability exists even if Defendant acted in good faith.

187.    Plaintiff seeks, on behalf of himself and the Class, a declaration that the above-described trade practices are fraudulent, unfair, and/or unlawful.

### PLAINTIFF'S FIFTH CAUSE OF ACTION
#### (Unjust Enrichment)
#### On Behalf of Himself and the Class

188.    Plaintiff realleges and incorporates by reference all paragraphs alleged herein.

189.    Plaintiff and Class members conferred a benefit on the Defendant by purchasing the Products.

190.    Defendant has been unjustly enriched in retaining the revenues from Plaintiff's and Class Members' purchases of the Products, which retention is unjust and inequitable, because Defendant sold Products that were not capable of being sold or held legally and which were legally worthless. Plaintiff paid a premium price for the Products.

191.    Because Defendant's retention of the non-gratuitous benefit conferred on them by Plaintiff and Class members is unjust and inequitable, Defendant must pay restitution and nonrestitutionary disgorgement of profits to Plaintiff and the Class members for its unjust enrichment, as ordered by the Court. Plaintiff and Class members have no adequate remedy at law to obtain this restitution.

192.    Plaintiff, therefore, seeks an order requiring Defendant to pay nonrestitutionay disgorgement of profits and make restitution to them and other members of the Class.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, respectfully requests that the Court enter judgement against Defendant as follows:

A.   Certification of the proposed Class, including appointment of Plaintiff's counsel as class counsel;

B.   An award of compensatory damages in an amount to be determined at trial;

C.   An award of statutory damages in an amount to be determined at trial;

D.   An award of punitive damages in an amount to be determined at trial;

E.   An award of treble damages;

F.   An award of restitution in an amount to be determined at trial;

G.   An award of nonrestitutionary disgorgement of profits in an amount to be determined at trial;

H.   An order requiring Defendant to pay both pre- and post-judgment interest on any amounts awarded;

I.   For reasonable attorney's fees and the costs of suit incurred; and

a.   For such further relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: November 8, 2024

**GUTRIDE SAFIER LLP**

*/s/ Hayley A. Reynolds/s/*
Seth A. Safier (State Bar No. 197427)
 seth@gutridesafier.com
Marie A. McCrary (State Bar No. 262670)
 marie@gutridesafier.com
Hayley Reynolds (State Bar No. 306427)

hayley@gutridesafier.com
100 Pine Street, Suite 1250
San Francisco, California 94111
Telephone: (415) 336-6545
Facsimile:  (415) 449-6469

*Attorneys for Plaintiff*

**Exhibit A**
**Page 1**

| Product # | Product Type | Flavor | Nutrient Content Claims | Sugar/Sodium[1] |
|---|---|---|---|---|
| 1. | Fruit Yogurt Smoothie | Peach Banana | "Excellent source of Calcium, Vitamins C & D"<br><br>"Check Out The Earth's Best Difference:<br>• Excellent Source of Calcium, Vitamin C & D<br>• Full serving of fruit per pouch | Total sugar: 14g<br>Added sugar: 0g<br><br>% Energy from sugar: 62% |
| 2. | Fruit Yogurt Smoothie | Pear Mango | "Excellent source of Calcium, Vitamins C & D"<br><br>"Check Out The Earth's Best Difference:<br>• Excellent Source of Calcium, Vitamin C & D" | Total sugar: 14g<br>Added sugar: 3g<br><br>% Energy from sugar: 62% |

[1] Nutrient information calculated based on the nutrition facts panels of the Products. The % energy from sugar is calculated according to the following formula: (total sugar grams per specified product weight ÷ kcal per specified product weight) x 400. *See* Nutrient and promotion profile model: supporting appropriate promotion of food products for infants and young children 6–36 months in the WHO European Region. Copenhagen: WHO Regional Office for Europe; 2022. Licence: CC BY-NC-SA 3.0 IGO.

Exhibit A
Page 2

| Product # | Product Type | Flavor | Nutrient Content Claims | Sugar/Sodium[1] |
|---|---|---|---|---|
| 3. | Fruit Yogurt Smoothie  | Apple Blueberry | "Excellent source of Calcium, Vitamins C & D". <br><br> "Check Out The Earth's Best Difference: <br> • Excellent Source of Calcium, Vitamin C & D <br> • Full serving of fruit per pouch | Total sugar: 16g <br> Added sugar: 4g <br><br> % Energy from sugar: 80% |
| 4. | Fruit Yogurt Smoothie  | Pineapple Orange Banana | "Excellent source of Calcium, Vitamins C & D" <br><br> "Check Out The Earth's Best Difference: <br> • Excellent Source of Calcium, Vitamins C & D" | Total sugar: 21g <br> Added sugar: 2g <br><br> % Energy from sugar: 76% |

| Product # | Product Type | Flavor | Nutrient Content Claims | Sugar/Sodium[1] |
|---|---|---|---|---|
| 5. | Fruit Yogurt Smoothie  | Mixed Berry | "Excellent source of Calcium, Vitamins C & D" <br> "Check Out The Earth's Best Difference: <br> • Excellent Source of Calcium, Vitamins C & D" | Total sugar: 12g <br> Added sugar: 4g <br> % Energy from sugar: 53% |
| 6. | Fruit Yogurt Smoothie  | Strawberry Banana | "Excellent source of Calcium, Vitamins C & D" <br> "Check Out The Earth's Best Difference: <br> • Excellent Source of Calcium, Vitamins C & D" | Total sugar: 17g <br> Added sugar: 0g <br> % Energy from sugar: 68% |

Exhibit A
Page 4

| Product # | Product Type | Flavor | Nutrient Content Claims | Sugar/Sodium[1] |
|---|---|---|---|---|
| 7. | Organic Crunchin' Crackers Wholesome Snacks  | Original | "Excellent source of Iron, Zinc, & six B vitamins"<br><br>"The Earth's Best Way to Grow:<br>● Excellent Source of Iron, Zinc and Six B Vitamins | Sodium/serving: 120mg<br><br>Sodium/100g: 600mg |
| 8. | Organic Letter of the Day Cookies  | Oatmeal Cinnamon | "Excellent source of Iron, Zinc, & six B vitamins"<br><br>"The Earth's Best Way to Grow:<br>● Excellent Source of Iron, Zinc and Six B Vitamins<br>● No Hydrogenated Oils – 0 Trans Fat per Serving | Total sugar: 6g<br>Added sugar: 5g<br>% Energy from sugar: 27%<br>Sodium/serving: 40mg<br>Sodium/100g: 200mg |

Exhibit A
Page 5

| Product # | Product Type | Flavor | Nutrient Content Claims | Sugar/Sodium[1] |
|---|---|---|---|---|
| 9. | Organic Letter of the Day Cookies  | Vanilla | "Excellent source of Iron, Zinc, & six B vitamins" "No Trans Fat" | Total sugar: 5g Added sugar: 5g % Energy from sugar: 22% Sodium/serving: 60mg Sodium/100g: 300mg |
| 10. | Protein Puree  | Veggie Red Lentil Bake With Olive Oil | "3g plant protein" | |

| Product # | Product Type | Flavor | Nutrient Content Claims | Sugar/Sodium[1] |
|---|---|---|---|---|
| 11. |  Protein Puree | Four Bean Feast | "3g plant protein" | |
| 12. |  Beef Medley with Vegetables Puree | Beef Medley with Vegetables | "4g PROTEIN per Serving" | |

| Product # | Product Type | Flavor | Nutrient Content Claims | Sugar/Sodium[1] |
|---|---|---|---|---|
| 13. | Chicken Casserole Puree  | Chicken Casserole | "4g PROTEIN per Serving" | |

# EXHIBIT B

1

2   I, Scott Pflaumer, declare:

3   1.  I am a Plaintiff in this action. If called upon to testify, I could and would

4 competently testify to the matters contained herein based upon my personal knowledge.

5   2.  I submit this Declaration pursuant to California Code of Civil Procedure section

6 2215.5 and California Civil Code section 1780(d).

7   3.  I reside in San Jose, California. As set forth in my complaint, beginning in or

8 around February 2023, I purchased Earth's Best products for my child when my child was under

9 the age of two, including the Beef Medley Protein Pouch, the Chicken Casserole Protein Pouch,

10 and the Vanilla Organic Letter of the Day Cookies. I purchased the products from Walmart and

11 Target in San Jose, California.

12   I declare under penalty of perjury under the laws of California that the foregoing is true

13 and correct.

14   Executed on _____11/7/2024_____, in San Jose, California.

15

16

17         Scott Pflaumer

18          Scott Pflaumer

19

20

21

22

23

24

25

26

27

28

DECLARATION RE CAL. CIV. CODE SECTION 1780(D) JURISDICTION